It's so cold in here. Oh yeah. Well since they have the rolls on, maybe you can sit back and... Let's teach them what we can learn. I'm sitting down like this, I like to sit comfortably, because it's the coolest thing ever. It's the coolest thing ever. It's not as cold as it used to be. It's not as cold as it used to be. Yes. It's not as cold as it used to be. It's good that I have a hat. Yeah. The thing is that I'm going to put my head in here, so I'm not going to get any sun. Right. It's good that I have a hat. I'm good at it.  I'm good at it. Yeah. Yeah. Yeah. Yeah. Yeah. Yeah. Yeah. Yeah. Yeah. Yeah. Yeah. Yeah.  Yeah. Yeah. Well I've never met Steve업er before? I have to say they're not the stuff that's so much more interesting than these people. They might have seen mine on a cabinet door, you know, and they offered payment in exchange. Is the judge going to have to tell him? TAR and? TAR. Well. We've appointed a judge on it. I'm the president of the company, so we have a female judge for this month. Do you know what age you were put through? 4.1. Could be wrong. 99.2. They asked for us, and I think they borrowed. I'm sorry? They asked for us, and we were borrowed. Excuse me. Yeah. Can I open this? Can I open this? Yeah. Yeah. If I remain silent, you won't recognize me. Okay. There you are. Thank you.  Thank you. I just want to wait until it comes up. Yeah, we can wait until it comes back. We're going to wait. All rise. Okay, Mr. Parker. Thank you. May it please the Court, my name is Warrington Parker. I represent and I've been appointed to represent on appeal Mr. Noe in this case. Mr. Noe was convicted on three separate counts, and I want to take the middle count first, which is the conspiracy, the Hobbs Act conspiracy, the conspiracy to commit robbery. I want to take that first because I think that's an outlet, that's a wedge to understand why it is that also there is insufficient evidence to find him guilty on transporting property, stolen property in interstate commerce, which is count one. The 924C, I believe, falls out if you find there's insufficient evidence as to the Hobbs Act. With that, it's critical to understand that Mr. Noe had never participated in a robbery before. There was no evidence of that. He's never been convicted of that. The government has, on this appeal, tried to argue that Mr. Noe was a crew member, as if that had significance in this appeal. And just for backdrop, there were – there was testimony about crew members in the case. These were individuals, the other defendants who had committed a variety of robberies from 1990 through to 1996. However, this case is not like a mafia case, and that's critical to understand. I've pointed out in this record, when they refer to Mr. Noe, they are not necessarily referring to him as a crew member. He's excluded from that definition. But he's not identified as a crew member by the cooperating informants or witnesses? No.  was identified as a crew member. However, on the drive up to Portland, Nonle Tron and Thok Tron had a conversation where at that time Mr. Noe was identified, according to Nonle Tron, as a crew member. However – If that testimony was believed by the jury, there was affirmative testimony in the record that he was. Yes. As to that point. And then you go on to the next conversation where crew member is used, the term crew member is used. And the same person, Thok Tron, says all the crew members were at this meeting. And he begins to delineate who he means by that. He's asked, was Mr. Noe at that meeting? And the answer is no, he was not at that meeting. And that would be the meeting for the planning of the robbery? The meeting for the planning of the robbery. In the Oregon, the Tualatin robbery. That's correct.  And that's why I'm fairly confident in arguing that crew member with regard specifically to Mr. Noe didn't have much significance. And then overall, in the overarching case, it doesn't have that much significance. Well, are you drawing a distinction between a crew member who would have worked for this illegal organization, enterprise, criminal conspiracy, whatever you want to call it, for the whole period of time, or are we talking about a crew member for the $5 million Tualatin robbery? Here's the key. I want to do both of those things. But I also want to make this final point. Crew member does not designate or denote knowledge of the robbery. You cannot get from claiming someone's a crew member, given its loose definition to begin with. Okay. Which is what I'm saying. And are you challenging, then, the sufficiency of the participation in the conspiracy by virtue of the fact that he drove the truck from the rest stop outside of Portland to San Jose and sold the stolen chips? I'd like to yes, is my direction. You're saying that is insufficient evidence from which a reasonable finder of fact could conclude that he knowingly joined the conspiracy to commit Hobbs Act robbery violence. Absolutely. And finally, I do not believe the evidence at all supports the idea that he stole a single I sold a single stolen chip. But the chips were sold through that business location, correct? Right. Through Megatech. Yeah. Megatech was a company that sold legitimate chips as well as illegitimate chips. The only person to have sold illegitimate chips on this record was Doc Tron. And now I have to make an admission of error. At the bottom of page 8 of my opening brief, I make two cites to the record. Unfortunately, I did not include all the pages I should have in the excerpt of record. But I would ask the Court to look at pages 20 to 32 of the March 27, 2001, volume of the transcript. March 22? 27. 27? Yes. So now let's go back to the robbery. And what does that generally describe? What it generally says is that this is a woman named Ms. Kumar who says, I bought chips from Doc Tron. I bought 30 to 40 times from Doc Tron. I kind of thought that they were illegal. I didn't really make a lot of inquiry. And the way I contacted Doc Tron was through his home number. I had a telephone number for a business called iTech, I believe it's called. What it doesn't say is I called him or contacted him at Megatech. What it does not say is I ever bought chips from Mr. Nunn. And so like the driving, then the argument is that mere presence either in driving the vehicle or working at Megatech is not enough. Well, working at Megatech isn't enough for a robbery, no matter what you do, even if you disagree with me, which I would suggest. Well, in the absence of evidence that he actually knew that the chips were stolen. Well, no, it's not proof that he knew of the robbery. Any sale of stolen chips, if he did that, which he did not. But any sale took place long after the robbery. It took place after the robbery. Look, that's not part of it. I'm really confused. I mean, because we're just going way down a path that has not much to do with anything. I mean, he's charged in count one of a conspiracy to transport stolen chips, right? Yes, ma'am. And what – I mean, just directly, forgetting how you label him, crew member or whatever, why isn't it sufficient to support the conviction that he in fact arranged to buy the truck, he drove the truck to Portland, he was in Portland at the time of the events with somebody else, and that doesn't appear to be disputed. He arranged to be at the spot where there was a transfer. He drove the stuff back to San Jose. He waited while it was offloaded, and he did participate in Megatrack, no matter whether he sold stolen chips or regular chips or whatever. What fails to – what has failed to prove on count one is that he knew that the chips were stolen. That is, you can – You mean from all that that I just said, you can't infer that? Absolutely. You can't infer it? Absolutely. I do not think you can infer that. Why? First, because, one, he was – they wanted to shield him from the robbery. He had never participated with these gentlemen in any robbery. Nobody ever – look. We're not talking about whether he knew about the firearm now. We're just talking about whether he knew that the chips that were being loaded in his – that he went to all this trouble for weren't stolen. Well, he wasn't there when the – You can infer that from this whole thing and from somebody else saying that, you know, he actually, you know, knew exactly what was going to happen. No one says he knew exactly what was going to happen. Well, they knew about the robbery. They just insulated him from the details. No. No one even says that he knew about the robbery. Well, Mr. Parker, what bothers me about your argument is that you're not allowing the jury to make what is, to me, a permissible inferential leap, that if you take  people, however many of them were, and then you drive it to San Jose and you unload it at some guy's – in some guy's living room, why can't a jury decide that that is sufficiently out of the ordinary to infer that he knew the illegal nature of the cargo that he was carrying? Yeah. I know that that's – that's my hung-up point, too, when I wrote the brief. So I don't want you to think I'm just being Pollyannish, perhaps, is the word. But the problem that I have is, with that scenario, is this. First, I agree that it's a problem that he was at the rest stop. That, to me, does not mean that he knew that they were going to rob anything, that is, get the chips through a robbery. That's the problem I have with the Hobbs Act file. What do you think the reasonable compensation for driving a truckload from Portland to San Jose would be? Didn't he get $50,000? No money, no. That's – there is, in the record, Thoptron saying the crew members were supposed to get money. Then there's a list of people who got money, and you won't see Mr. No's name in that list. There's no evidence he got money. There's no evidence, in fact, that he unloaded, with all due respect, any of the chips. He was certainly at the house at the time the chips were unloaded, and it's the house of his cousin, understand? Now, his cousin happens to be the primary name defendant, so I don't want to hide that particular fact. But he didn't unload the chips. The chips weren't even in plain view. There is a site I know, and the government's brief. But what I think is critical is there were two different trucks. One was a minivan, and one is called the truck throughout. In the minivan, there is testimony at the – Kennedy, according to Thatcher's testimony, the crew members were to be paid $50,000. Correct. And Mr. No was a member – was a crew member. Yes. And then Mr. Tron is asked who was paid money, and he starts running through the names of people, and in fact, some people got 160,000, some people got 100,000, some people got 50,000, and there's no identification of Mr. No as receiving money. At all. And so that's why I have the conceptual problem with saying his being at the rest stop, which I know is the most peculiar, curious, suspicious evidence against Mr. Tron. No. I know that's the problem with the argument. But I'm comfortable with the argument, nonetheless, because I can – I can feel as a matter of law that no reasonable finder of fact could have inferred from this suspicious evidence that Mr. No knew that he was dealing in stolen commodities. I want you to rule first that Mr. No did not know that there was a robbery that took place, or did not conspire to commit the robbery. I'm not the finder of fact. I can't – what I have to do is look at the record on the facts that you adduced at trial and answer the question that the Supreme Court laid out in Jackson, the reasonable fact finder test. And you really are asking us to say that even if we take all the facts established in the record and the like most favorable to the government, no reasonable finder of fact could have inferred that he knew the chips were stolen. And I have a problem with that given the circumstances under which he acquired and disposed of the chips. I mean, I am willing – well, first, let me answer this one. I'm not asking you to do anything more unusual than what this Court has done any number of times in the cases we cite in our brief. It's not, to me, that peculiar to do. It does not happen all the time, but this Court does regularly, where there are a sufficient number of cases to indicate, the Court regularly reviews and sets aside verdicts. Number two, I do not want to spend a lot of – I mean, I could – we could argue I have a problem, and I think the weakest argument I have is the transportation of stolen property. I know that. I just have a conceptual problem and a legal problem with pulling Mr. No in for the robbery, the Hobbs Act robbery. And I say this, one, with the truck. The jury didn't find that the truck was purchased in furtherance of at least the count one conspiracy, where they had to make a specific finding of overt act. Number two, the government argued that Mr. Nonlay-Tron or Thok-Tron gave Mr. No $13,000 for that truck. And if you look at the government's excerpt of record at page 238, Mr. No financed the entirety of that truck. So the purchase price was 13. There was a finance charge of 8,000. He financed it. And now, then, I'm left with he was in Portland. I do have the argument, of course, that he was shielded off. He did not see eight or nine people at the truck stop or at the rest stop, certainly not before the robbery, and indeed not even after the robbery. And that's why I'm comfortable with the argument that he could have been at that truck stop for a lot of different reasons. He could have even understood he was getting chips, but that does not mean he knew that that night, on October 31st, people were going to go to Oki and commit the robbery, particularly since he was not involved in that process. It was all at night. It was late at night. It was wee hours of the night. And that's why spending time talking about the transportation is an issue. Spending time talking about how they got those chips, which is what Mr. No was not necessarily privy to, and there's no evidence he was privy to. That, to me, is critical. Mr. Parker, let me ask you this question. I want to move on here to the firearm. On the assumption that we were to reverse the firearm count, what, if any effect, would this have on the sentence that was imposed? It had received a 60-month concurrent with a 108 on the two first counts, so it's 108. Concurrent or consecutive? It's a concurrent. The — I'm sorry. I always get these mixed up. Consecutive means they added on. At the same time. So he's got 108 months on the first two counts, essentially. The extra 60 months were added on. Okay. So we would have to remand for resentencing if we — Yes. If we give you the relief you're asking for on the firearms count. And finally, you need to remand for resentencing anyway on the Hobbs Act charge, because we have the Blakely case now and the Ameling case. And in that, those — there are — these are at issue. As we speak, the Supreme Court is hearing our argument. No kidding. So who knows where it's going to go, but there's plus two points for bodily injury. That's not alleged. There are another additional points, two points for physical restraint. The Court found a loss of between $2.5 million to $6 million. Now, I have to be fair, the indictment in Count II does allege that the value of the was taken. From Oki. From Oki, yes. And then there are other sentencing issues which we've raised in our brief. And I want to save four seconds for them. Oh, seven seconds. May it please the Court, I'm Kirby Heller. I represent the government. Let me just make a few points about some of the evidence that Mr. Noh is contesting in this case. The first, in no particular order, has to do with the purchase of the truck. Mr. Noh contends that the jury did not find that the purchase of the truck was a furtherance of the conspiracy. I don't believe you can read the verdict form that way. The verdict form lists the individual overt acts. Of course, the jury was instructed it only had to find one, found more than one. But it had a choice to say yes and no, and it said yes on several of them. It didn't say no. And so I don't believe it's a fair inference to say that they did not find that. I missed that. So the jury was actually given a special verdict form to find overt acts and furtherance of the conspiracy? Yes, Your Honor. And they left it blank. They left it blank, as they left many other ones blank, which, considering the evidence in this case, it was hard to believe, actually, that they wouldn't have found them. They had to do with the other defendants and prior robberies and burglaries. But they didn't go to they didn't say yes to all of them. The second is the payment of the truck. Now, the evidence is not entirely consistent. I think it's a fair inference, based on the documents, that the jury could have found that, in fact, it was paid by cash. There are two conflicting documents in that package. But that doesn't really matter. The point was that the testimony was that either Non-Latron or Thotstron asked Mr. Ngo to go buy this truck. Obviously, they were trying to conceal their ownership of it. It looks like – I'm sorry, not Thotstron. It was Non-Latron or Tin Nguyen. And it looks like from the documents that it was Tin who actually set that up for him. Of course, we have all the very suspicious circumstances surrounding the robbery. Itself, like it took place in the wee hours of the night, it involves all these transfers of vans and trucks. But even if all that weren't sufficient for the jury to find that Mr. Ngo was aware that the – that there was a robbery, we then have the truck being delivered back to the rest area. The stolen chips are in this truck. All Mr. Ngo has to do is turn his head and see that there are stolen – that there are chips in the back of this truck that previously was emptied. I may be confusing this with another similar case, but weren't the chips in packages? Like some of them were in cylinders and you might not have been able to look at the packaging and tell what was in them? They were on – the testimony that described the chips was that they were either on boards, which I believe would make them very visible, or in aluminum tubes. And the testimony gave the length of the – of the aluminum tubes. So because he worked at Megatech, he should have known what they were by simply looking at that? Is that what you're – is that what you're – Yes, but the boards themselves, I believe, would – I'm not sure I know exactly what a chip looks like, but I know the boards that are in our computers have these things on them. That's – that's fairly visible. They weren't wrapped up, in other words, in boxes. They were just in the back of his truck. As to Megatech, that's just – that's after the fact, of course, but that would be fair for the jury to infer some knowledge by the fact that he was there. There's no testimony directly about how that place was run, who was doing what as to Mr. Noe and Fas-Tran. We don't certainly know from the – this – the evidence that was introduced that Fas-Tran stole – sold the stolen chips and Mr. Noe sold the ones that weren't stolen. We know from this record that he was a business associate of Fas-Tran and also described, I believe, as his partner, and then when Fas-Tran was in Vietnam, Mr. Noe closed the business, which connotes some level of authority there. And finally, the fact that Mr. Noe was present when the chips were unloaded at the relatives – at Nan's relatives' house, I think is very significant, not only for the fact, of course, that he was there and could see the full scope of the robbery and how much material was stolen, but also the fact that if he really were – was not privy to the – what was going on, if he really was an unwitting dupe, he would be – it's unlikely, and it would be fair for the jury to infer, that he wouldn't be there when the chips were at their final resting place, that you would try to insulate someone who didn't know about this robbery from that final destination. Well, he drove the truck to the final destination. He did, Your Honor. And then he stayed there, and then the van arrived. So he was – he was there throughout that process. I believe that also is fair for the jury to base its finding of knowledge on. Are you going to go on to the firearm charge? Yes. I was just going to turn to that, Your Honor. The firearm charge, of course, is based on a Pinkerton theory. And what the jury had to find was that it was reasonably foreseeable for Mr. Noe to know that this was an armed robbery or that guns would be used, were used as a natural consequence of this robbery. And there are a couple of factors that the jury could base this on. First of all, though you can't look at this alone, they can look at the nature of the offense. This was a robbery, and it was a robbery in the middle of the night. This was – Mr. Noe knew that it wouldn't be a burglary. Well, Your Honor, that is an inference that the jury would have to make. And this is – But from what would the inference be made? I mean, this was in the middle of the night, right? Yes. How – where is the evidence that Noe knew that the thieves were going to use force to subtract the goods rather than stealth and get in by night? There are a couple of factors, I believe, that the jury could have relied on. One is that this is obviously going to be a large-scale stealing of chips. And burglaries can't be large-scale? That's just one factor, Your Honor, that it was – it's going to be a truckload and maybe more so of material. Second, that this is a very well-planned event involving, you know, many people going out of town, a truck bought for this purpose, all of which goes to the fact that it would be – that it would be unlikely for the organizers to leave to chance the fact that there isn't, at a minimum, a security guard. After all, we're talking about a manufacturing plant, someone that makes chips and makes enough that it's worth their while to go through this very elaborate plan to go to Portland and steal them. So I think it would be a fair inference for the jury and reasonably foreseeable to Mr. Noe to assume that, again, at a minimum, there's a security guard. And they're not going to leave to chance the fact that this man or woman, the security guard, is not going to have to be subdued and you would have to use a gun to do that. This Court, in other contexts, has certainly looked at the likelihood of guns in bank robberies, for example. And when you even go back as far as the Terry case – But it's not for the finder of fact or the district judge, if you're going to enhance, to say, well, it's a bank, and therefore, we know that guns are sometimes used to rob banks. That's correct, Your Honor. I'm not arguing that we just should look at the nature of the offense. I think it's one factor, but not just that. I think you have to look at the scope of this crime. I think you have to look at how well planned it was and the coordination  of the crime. And I don't think that's going to lead to chance, this one factor. That could throw the whole thing off. The thing that bothers me very candidly is that I think as judges that we have to be very careful in multi-defendant criminal prosecutions that the little fish doesn't get scooped up in the net with the big fish and that the same rules of evidence to establish all the elements of the offense have been met with regard to the little fish. If we take the evidence in the light most favorable to the government, you haven't got any evidence that Mr. Neo was involved in any of the elaborate planning that obviously occurred. And we do have the fact of the very suspicious transfer of the cargo at the midnight rest stop, but – and I guess we have the fact that he stayed at the same motel where some of the other robbery members stayed. And I think I read somewhere in one of your briefs that they all ended up for breakfast or something and they weren't supposed to be seen together. But again, that suggests to me that people were going out of their way to compartmentalize this guy. So aside from the rest stop and everything that happens after that, what evidence is there that would support the jury's conclusion that he knew all about the takeover or takedown robbery? Right. Your Honor, I certainly can't offer any other specific evidence that he had actual knowledge of these guns. There is no evidence of that. Now, you know, as to the planning, it is true that he wasn't at – there was no evidence that he was at those meetings. And, in fact, at one point Mr. Tron said he wasn't at a specific meeting when asked. But as the district court said, certainly he was involved in some planning. He wouldn't have been able to do what he did if someone hadn't given him instructions and he did, you know, quite a bit. He bought the truck, he shows up in Portland, he stays in a motel with others. So somehow he's getting instructions, obviously not from Thatch Tron, probably from his cousin. So he's involved in some planning. But the argument really has to be, you know, purely a Pinkerton one, that given the circumstances of this particular crime, it was reasonably foreseeable. Now, this jury – But that's where I'm having the hard part, is, is it reasonable to foresee from his conduct after the fact how his co-conspirators came into possession of the chips? I guess I'd have less of a problem if the government could have shown that this guy had joined the conspiracy earlier in the process. And maybe it's enough that he was told, go to Portland, stay at this motel, don't associate with other Vietnamese or Asian-appearing people that you run into in the restaurant and meet us at 4 a.m. in the morning at the rest stop south of Portland. But beyond that, there isn't much there. Right, Your Honor. I agree. It would have been easier for me to be up here saying he knew that there were – he knew that there were guns because he went to some of the meetings where everyone else didn't. They talked about this. And so we're really relying on the way this crime was carried out, the care about it, the scope of it, to say that it was reasonable. As to the little fish getting caught up in the net, certainly that's always a valid concern. I should point out, perhaps it's a little peripheral, but that this was a very careful jury. This was a jury, in fact, that acquitted one of the defendants. And this whole argument about Mr. Noe's knowledge was argued to the jury, and the Pinkerton theory was discussed to the jury. If there are no other questions, we will submit on our brief. Thank you. Okay. Mr. Carter. I have eight. I have nine. Okay. I'm just going to say this. Mr. Rupert, the jury's statement is that he didn't have a gun at the time of the shooting, however he got to whatever was said to him to get him to Portland. That does not prove that anyone told him that there would be a gun. And there's literally nothing at all. But that's not the test. The test is not whether anybody told him. The test is whether it was reasonably foreseeable. And the jury has absolutely no idea. I'll give you this hypothesis. Suppose a gun had gone off at the Oki, and somebody had been hurt, right? And that person brought a civil action. Would it not be reasonable, foreseeable, reasonably foreseeable for Mr. Noe to be held in as a defendant in a joint enterprise? It would be maybe reasonable foreseeable that he would be sued, but that's not my No, no. Sued and recovered against. And that's where you and I would have a dispute at least, because I do not think it's reasonably foreseeable for Mr. Noe to be held criminally responsible when he's told, he's told, show up at a rest stop. Let's just pause at this. Show up at a rest stop. You might see some other agents. Don't talk to them. We're going to bring you some stuff. If he's told that bare bones, he would do all the things his cousin was asking him to do it. He would do all those things. And he'd be at that rest stop. He might even scratch his head and say, this is mysterious to me. But that would not mean that he would know that they were going to do a takeover robbery. And again, Judge Breyer, to go to your notion, in the middle of the night, it is not foreseeable that any guards would be at any particular place. And if you're at the place, they didn't even tell him where they were going to rob. It's not reasonably foreseeable, therefore. He knows he's going to transport enough stuff to require a truck, right? Yes. So it's a sizable heist, right? Assuming that he knew that, yeah, assuming you could say from the truck, I would know that I'm going to be carrying a lot of stuff versus I just need a truck. Yes, but that doesn't mean that there's going to be anyone there, that this would be a robbery, that they weren't just picking things up. And I think that that is critical. And I think we cite four cases, there are four cases that are in the brief on foreseeability. And I think all of them at least indicate involvement in the planning, someone handing over the gun in the presence of the defendant. Or one case is Fonseca, I believe it is, has very little discretion, but it says it was a drug case. And if it's a drug case, then despite what Castaneda says, guns go with drugs. But in that, I think there is a breakdown between him sitting at the rest stop and any knowledge of what was going to happen, and that actually conforms with the government's closing, which is if stopped, he couldn't say what happened. And with that, I would submit on the briefs. Okay. Thank you for your argument. The matter just argued will be submitted and the Court will stand and recess.
judges: Rymer, Tallman, Bea